JOURNAL ENTRY AND OPINION
{¶ 1} Brandon Jones ("Jones") appeals his conviction on charges of aggravated murder and aggravated robbery following a jury trial. He claims his conviction is against the manifest weight of the evidence and the State presented insufficient evidence to convict him. He also asserts the court erred in denying his motion for acquittal, in failing to instruct the jury on a lesser included offense, in failing to properly support its findings at sentencing, and in ordering the convictions served consecutively since the charges were allied offenses. For the following reasons, we affirm Jones' conviction and sentence.
 {¶ 2} A review of the record reveals that Danny Neal ("Neal") and his girlfriend, Jennifer Andrews, lived together in a two-family house at 1330 Brockley Avenue in Lakewood. In late July 2005, Ms. Andrews was hospitalized for kidney *Page 2 
and back problems and remained in the hospital through September 2, 2005. During her absence, Neal lived in the house alone.
 {¶ 3} In early August 2005, Starlene Pawul ("Pawul"), an admitted crack cocaine user and prostitute, met Neal and Brandon Jones at a crack house on Detroit and West 83rd Street. Following a four-day crack cocaine binge, on August 10, 2005, Pawul again encountered Jones and Neal in an apartment complex on West Boulevard and Detroit Avenue in Cleveland. Although Pawul was there with another customer, she asked Jones and Neal to wait. The men waited until she had finished her business and then made plans to go to Neal's house in Lakewood. Pawul claimed she had worked out an arrangement with Neal prior to leaving the apartment complex and that Neal told her that money was not a problem. Believing this to be the case, Pawul had a customer drive her to the Brockley Avenue home.
 {¶ 4} After the three entered the house, Jones and Neal began smoking crack. Pawul then joined them and smoked her own crack with her own pipe. Afterwards, she invited Neal into the bedroom. Pawul and Neal went into the bedroom and left Jones alone in the dining room. Neal again began smoking crack cocaine after entering the bedroom. Pawul repeatedly asked Neal if he wanted to "take care of business," and he replied that he did not want to cheat on his girlfriend. Pawul became agitated and demanded bus fare, which Neal refused to provide. *Page 3 
 {¶ 5} Shortly thereafter, Pawul heard three "pops" and saw Jones standing over Neal and hitting him with his fists. Pawul told him to stop, but Jones continued to hit Neal with a frying pan. Jones then pulled down Neal's pants and urinated on him. Pawul entered the fray and grabbed a small statute of an elephant and hit Neal on the top of his head.
 {¶ 6} After the incident, Jones and Pawul went back to the apartment at Detroit Avenue and West Boulevard and smoked more crack. She did not tell the police what had happened.
 {¶ 7} In the early morning hours of August 11, 2005, Lakewood Police Officer Timothy Schad responded to a call at 1334 Brockley Avenue regarding an intoxicated male in the area. After he arrived, he found a semi-coherent male lying on the porch in pools of blood and wearing only boxer shorts. The man was bleeding, his head and eyes were swollen, and he appeared to have several lacerations on his face. Although he had difficulty speaking, he was able to tell the officer that his name was "Danny." He also told the officer that he was assaulted down the street by three black males.
 {¶ 8} Officer Schad called for additional police units and a rescue squad, which arrived shortly thereafter. After the victim was taken to the hospital, the remaining officers continued their investigation. They followed a trail of blood from 1334 Brockley to 1330 Brockley, the home Neal shared with Ms. Andrews. When *Page 4 
the officers arrived at 1330 Brockley, they found that the door was open and the screen was ripped in the lower portion of the door. As blood was clearly visible on the interior of the residence, the men identified themselves as police officers and entered the house to investigate with weapons drawn.
 {¶ 9} The officers found large amounts of blood through the hallways, the kitchen, the dining room, a baby's room and another bedroom.
 {¶ 10} Jones was arrested at the Drug Mart Discount store in Lakewood on August 15, 2005. The officer noted that Jones' hands were battered and scraped, and that he had a large cut on the palm of his right hand.
 {¶ 11} Jones was indicted on two counts of aggravated murder, in violation of R.C. 2903.01, and two counts of aggravated robbery, in violation of R.C. 2911.01. Following a jury trial, Jones was found guilty of all charges. At sentencing, the trial court determined that the two charges of aggravated murder merged as did the two counts of robbery. Jones was sentenced to life in prison with no parole eligibility for thirty years on the aggravated murder charges, and ten years on the robbery charges, sentence to be served consecutive to the aggravated murder conviction.
I. WEIGHT AND SUFFICIENCY OF THE EVIDENCE
 {¶ 12} Jones submits that the State failed to establish his guilt of both aggravated murder and aggravated robbery. He maintains that Ms. Pawul's testimony was unreliable, and that she admitted lying to the trial judge about her *Page 5 
involvement in the case when she pleaded guilty to involuntary manslaughter and aggravated robbery. He emphasizes that Pawul's written statement is materially different from her testimony. Finally, Jones asserts that the record lacks any evidence of theft. As a result, he submits that the jury lost its way in reaching the verdict.
 {¶ 13} As they all relate to the evidence presented at trial, we address Jones' first, second, and third assignments of error together.
 {¶ 14} Jones was convicted of aggravated murder, in violation of R.C.2903.01(A) (B) which states:
 "(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape."
 {¶ 15} Jones cites to State v. Cotton (1978), 56 Ohio St.2d 8, where the Supreme Court held that "`prior calculation and design' is a more stringent element than the `deliberate and premeditated malice' which was required under prior law." Jones then cites to State v. Jenkins
(1976), 48 Ohio App.2d 99, 101-102, which held that,
 "Prior calculation and design sets up a more demanding standard than the old first degree murder standard of "deliberate and premeditated malice." Prior calculation and design requires the accused to have *Page 6 
killed purposefully after devising a plan or scheme to kill. There must be some kind of studied analysis with its object being the means by which to kill. The kind of momentary deliberation or instantaneous premeditation that was the accepted standard under the old statute, as exemplified by State v. Schaffer (1960), 113 Ohio App. 125, is no longer sufficient or acceptable."
 {¶ 16} In making a determination whether a homicide was committed with "prior calculation and design," the Jenkins court found that,
 "Some of the important factors to be examined and considered in deciding whether a homicide was committed with prior calculation and design include: whether the accused knew the victim prior to the crime, as opposed to a random meeting, and if the victim was known to him whether the relationship had been strained; whether thought and preparation were given by the accused to the weapon he used to kill and/or the site on which the homicide was to be committed as compared to no such thought or preparation; and whether the act was drawn out over a period of time as against an almost instantaneous eruption of events. These factors must be considered and weighed together and viewed under the totality of all circumstances of the homicide. When the evidence adduced at trial establishes that the victim was unknown to the accused prior to the crime, and that there was little or no preparation, but rather that the crime was an instantaneous eruption of events, then the trial court shall not charge the jury on aggravated murder. If the evidence adduced at trial is legally insufficient to establish any essential element of the crime charged the trial court shall not charge the jury as to that offense. See, State v. Channer (1926), 115 Ohio St. 350; State v. Manago (1974), 38 Ohio St.2d 223."
 {¶ 17} Jones was also convicted of two counts of aggravated robbery pursuant to R.C. 2911.01(A)(1) (3), which provides:
 "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:(1) Have a deadly weapon on or about the offender's person or under the offender's *Page 7 
control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; * * *
 (3) Inflict, or attempt to inflict, serious physical harm on another."
 {¶ 18} In evaluating a challenge to the verdict based on the manifest weight of the evidence, a court sits as the thirteenth juror, and intrudes its judgment into proceedings that it finds to be fatally flawed through misrepresentation or misapplication of the evidence by a jury that has "lost its way." State v. Thompkins 78 Ohio St.3d 380, 387,1997-Ohio-52. As the Ohio Supreme Court declared,
 "Weight of the evidence concerns `the inclination of the greater amount of credible evidence offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'
 * * * `The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id. (Internal citations omitted.)
 {¶ 19} In State v. Bruno, Cuyahoga App. No. 84883, 2005-Ohio-1862, we stated that the court must be mindful that the weight of the evidence and the credibility of witnesses are matters primarily for the trier of fact. A reviewing court will not reverse a verdict where the trier of fact could reasonably conclude from *Page 8 
substantial evidence that the prosecution proved the offense beyond a reasonable doubt. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus; State v. Eley (1978), 56 Ohio St.2d 169. Moreover, in reviewing a claim that a conviction is against the manifest weight of the evidence, the conviction cannot be reversed unless it is obvious that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Garrow (1995), 103 Ohio App.3d 368.
 {¶ 20} Finally, Jones cites to Crim.R. 29(A) which governs motions for acquittal and provides for a judgment of acquittal if the evidence is insufficient to sustain a conviction. An appellate court's function in reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, 273.
 {¶ 21} A verdict will not be disturbed on appeal unless reasonable minds could not reach the conclusion reached by the trier of fact. Id. In essence, sufficiency is a test of adequacy. State v. Thompkins,78 Ohio St.3d at 386-387. A criminal conviction is not supported by sufficient evidence when the prosecution has failed to "prove beyond a reasonable doubt every fact necessary to constitute any crime for which it prosecutes a defendant." State v. Robinson (1976), 47 Ohio St.2d 103,108, *Page 9 
citing In re Winship (1970), 397 U.S. 358. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. State v. DeHass, 10 Ohio St.2d at 231.
 {¶ 22} At trial, the jury heard testimony from several witnesses. Preliminary testimony came from Jennifer Andrews, Neal's girlfriend, who testified that she spoke to Neal on the day of the murder and that he appeared paranoid and in fear. Tr. 541. She further testified that on the day he was killed, Neal was to return $660 that he had previously taken from her bank account. Tr. 548. She knew that he had at least $600 on him on the day of the murder because he showed her this money when visiting her at the hospital. Tr. 548-549.
 {¶ 23} The only other person present at the time of the murder, Starlene Pawul, testified that she pleaded guilty to involuntary manslaughter. Pawul testified that she was originally charged with aggravated murder and faced the possibility of life without parole. To avoid this sentence, she pleaded guilty to the lesser charges of involuntary manslaughter and robbery. Tr. 796.
 {¶ 24} As a witness to the crime, Pawul claimed that she saw Jones standing over Neal, hitting him on the side of the face and punching him with a closed fist. Tr. 702. Neal was attempting to get up after the beating, but Jones continued the attack. Tr. 702. She also witnessed Jones grabbing a frying pan from the kitchen sink and attacking Neal, hitting him on the head. Tr. 704. During the attack, Pawul testified *Page 10 
testified that she watched Jones drag Neal to the middle of the kitchen floor and proceeded to remove Neal's pants. Jones then urinated on him. Tr. 707.
 {¶ 25} Jones then instructed Pawul to find him new clothes since he was covered in blood. Tr. 709. Pawul testified that she pulled some clothes from a laundry hamper, and then grabbed a statute of an elephant off of Neal's mantle to use as protection from Neal and Jones. Tr. 710. She then claimed that Neal started coming toward her, so she struck him with the statue. Tr. 711. According to Pawul, Jones directed her to hit Neal with the statue. Tr. 711.
 {¶ 26} During the beating, Pawul claimed that she heard Jones say to Neal, "Where is it at? Where is the shit at, man? Where is it at?" Tr. 715. Neal responded, "Okay, man. Okay, I'll get it for you," to which Jones responded, "No, you tell me and I'll get it myself." Tr. 715.
 {¶ 27} Finally, Pawul claimed that she saw Jones going through Neal's pockets. To explain any inconsistencies in her statements, Pawul claimed that during her first interview she was very tired and her nerves were bad. Tr. 816.
 {¶ 28} The State also presented the testimony of several investigatory officers. Lakewood Police Officer Patrick Foye testified that he responded to a call from the manager of the Drug Mart in Lakewood, claiming that the man they were looking for was in the store. Tr. 652. Jones was arrested in the store. Tr. 652. When placing Jones' in handcuffs, Officer Foye noticed that Jones' hands were battered and *Page 11 
scraped and that he had a large cut on the palm of his hand. Tr. 654. Officer Foye also noted that Jones was wearing shoes with a very distinctive pattern on the soles- a pattern that the officer recognized as one left in a bloodstain at the crime scene. Tr. 658.
 {¶ 29} Further, Lt. Anthony Ciresi, an officer with the Lakewood Police Department, testified that he was alerted to some potential clothing evidence in a storefront entrance of a "Total Foot Care" store on Detroit Avenue. He discovered a white t-shirt and a pair of jean shorts and found a receipt in the pocket of the shorts. Tr. 876-877. He immediately turned these items over to the crime lab for analysis. Tr. 880-881.
 {¶ 30} Brian Sippel is the assistant manager at the Drug Mart in Lakewood. At trial, Sippel testified that the Drug Mart has a surveillance camera inside the store, and that the Lakewood Police contacted him to obtain surveillance tapes. Tr. 887-888. He testified that a man matching Jones' description came into the store wearing the same clothing that Lt. Ciresi discovered in the entrance of Total Foot Care. Tr. 890.
 {¶ 31} With regard to the evidence found at the scene, the State presented the testimony of Thomas Ramsburg, a forensic scientist and fingerprint expert with the Ohio Bureau of Criminal Investigation who works with latent fingerprints. Tr. 623. He testified that the police submitted several items to him in order to match *Page 12 
fingerprints, including a ceramic figure, a plastic lighter, and a key chain. Tr. 627. He compared the prints on these items to Jones' fingerprint and palm print. Tr. 627. Mr. Ramsburg testified that he took fingerprints from two Drug Mart receipts and compared these fingerprints to a fingerprint card provided by Jones. Tr. 628-629. He found a positive match to Jones' right thumb. Tr. 632. Mr. Ramsburg also found four partial latent prints on a gallon of wood protector which he also matched to Jones' prints. Tr. 636-637.
 {¶ 32} The court also heard testimony from Carey Martin, a DNA analyst from the Cuyahoga County Coroner's Office. She testified at trial that she received fingernail scrapings from Neal, and a section of Jones' white t-shirt and jean shorts. Tr. 852. Ms. Martin testified that the blood found underneath the victim's fingernails was his own, but the jean shorts contained Neal's blood. Tr. 854.
 {¶ 33} Dr. David Dolinak of the Cuyahoga County Coroner's office testified that he examined Neal. He noted that Neal had multiple blunt-force injuries, including swollen bloody eyes, multiple contusions and a tear to his scalp. Tr. 433-436. Neal also had a one-inch tear in the skin at the top of his nose and tearing under his eyes, left cheek, and in front of his left ear. Tr. 438-439. In total, there were fourteen large tears and multiple small tears. Tr. 451. Dr. Dolinak testified that the plaster elephant found at the scene could not have caused the fourteen large tears. Tr. 457-458. At *Page 13 
a minimum, Neal's body showed twenty-five blows of blunt-force trauma. Tr. 437, 443, 452. These injuries were consistent with being hit with a frying pan. Tr. 444.
 {¶ 34} It is clear that the record contained sufficient evidence to survive a motion for acquittal and to convict Jones on the indicted charges. Although Jones asserts that there are many inconsistencies in Pawul's testimony, her testimony was corroborated by other evidence presented at trial. Pawul claimed to have seen Jones attack Neal with a frying pan, and this evidence was corroborated with the dented frying pan and crime scene photographs of a bloody frying pan. Pawul also testified that Jones dragged Neal through the house and then removed Neal's pants. Again, this statement was corroborated by testimony that Neal was initially discovered wearing only his boxer shorts.
 {¶ 35} Additionally, Pawul claimed that she witnessed Jones pouring the contents of a mop bucket onto the victim-a statement supported by the testimony of Detective Miller who stated that he smelled the odor of Pine Sol when he entered the victim's home. Tr. 923. As to the final statement that Jones ordered Pawul to find him new clothing and discarded the bloody clothes he had been wearing, Carey Martin of the coroner's office offered testimony that the discarded shirt and jean shorts that she analyzed contained Neal's blood.
 {¶ 36} A conviction of aggravated murder requires prior calculation and design. As the Ohio Supreme Court held in State v. Coley,93 Ohio St.3d 253, 2001-Ohio-1340, *Page 14 
"[p]rior calculation and design requires a scheme designed to implement the calculated decision to kill." The court went on to find that, "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within minutes." Id. at 264.
 {¶ 37} The State points this court to Cotton, supra, where the defendant ran from a store and then fought with a police officer outside of the store. The defendant shot the officer in the arm, and when the officer continued to chase the defendant, the defendant then turned around, assumed a shooting position and fatally shot the officer. When analyzing the `prior calculation and design' element, the court held that, "the evidence adduced reveals the presence of sufficient time and opportunity between the appearance of the police officers on the scene and the fatal shot into [the officer] for the planning of the killing and for the planning to constitute prior calculation." Id. at 10.
 {¶ 38} As Dr. Dolinak testified, Neal suffered over twenty-five blows. Tr. 437, 442, 452. Further, it is clear from the gruesome crime scene that Neal's beating occurred throughout the entire house. The massive amount of blood in several rooms of the house indicate that Neal's murder was not a single, isolated event, but rather an elongated, deliberate attack. Jones used several different weapons throughout his attack on Neal and carried the attack through several different rooms of the house. It is also apparent that the attack took place over time and was not *Page 15 
instantaneous, since Jones took the time to drag Neal through several rooms of the home, strip off the majority of his clothing, urinate on him, and then dump the contents of a mop bucket on him.
 {¶ 39} With regard to the robbery conviction, the jury heard testimony from Ms. Andrews that Neal was carrying over $600 on the day of the murder. Starlene Pawul testified that as Jones was attacking Neal, he said "[w]here is it at? Where is the shit at, man? Where is it at?" Tr. 715.
 {¶ 40} She then claimed that she saw Jones rummaging through Neal's pants.
 {¶ 41} In total, and based upon the testimony presented at trial, while viewing this evidence in a light favorable to the prosecution, it is clear that the evidence was sufficient to support a determination of Jones' guilt beyond a reasonable doubt. The evidence provided was of sufficient strength to survive a Crim.R. 29 motion. Moreover, based upon the collective testimony and evidence presented at trial, it is clear that a jury could find that Jones acted with prior calculation and design and that this evidence presented was neither insufficient to support Jones' conviction or against the manifest weight of the evidence.
 {¶ 42} For these reasons, we find that Jones' first, second, and third assignments of error lack merit.
 II. LESSER INCLUDED OFFENSE *Page 16 
 {¶ 43} Jones was indicted for aggravated murder in violation of R.C.2903.01(A). The trial court instructed the jury on the following offense: aggravated murder, murder in violation of R.C. 2903.02, and involuntary manslaughter in violation of R.C. 2903.04. Although Jones' counsel requested that the jury be instructed on the offense of voluntary manslaughter, this request was denied. In his fourth assignment of error, Jones maintains that the trial court erred in failing to instruct the jury on this lesser included offense of voluntary manslaughter.
 {¶ 44} "[E]ven though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." State v. Thomas,40 Ohio St.3d 213, paragraph two of the syllabus. In making this determination, the trial court must view the evidence in the light most favorable to the defendant. State v. Campbell (1994), 69 Ohio St.3d 38, 47-48. When the evidence presented at trial does not meet this test, a charge on the lesser included offense is not required. State v. Kidder (1987),32 Ohio St.3d 279, 282-283.
 {¶ 45} R.C. 2903.03(A), which defines voluntary manslaughter, provides, "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly *Page 17 
cause the death of another * * *." Voluntary manslaughter is an inferior degree of aggravated murder. See State v. Tyler (1990),50 Ohio St.3d 24, 36, 553 N.E.2d 576.
 {¶ 46} The Ohio Supreme Court has held that, a defendant charged with aggravated murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the aggravated murder charge and a conviction of voluntary manslaughter. State v. Shane (1992),63 Ohio St.3d 630, 632. Before giving a voluntary manslaughter instruction in a murder case, the trial court must determine "whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction." Id. at paragraph one of the syllabus. In the instant case, there is no indication in the evidence presented at trial that Neal did anything to provoke Jones. Under R.C.2903.03(A), the provocation must be "occasioned by the victim." As the Ohio Supreme Court noted in State v. Conway, 108 Ohio St.3d 214,2006-Ohio-791, "The voluntary manslaughter statute was amended in 1982 to include the phrase "occasioned by the victim," which forecloses application of the statute to situations, as here, where the provocation came from someone other than the person killed. Am. Sub. H.B. No. 103, 139 Ohio Laws, Part I, 1761, 1763. See, also, 2 LaFave Scott, Substantive Criminal Law (2003) 510-511, Section 15.2(g)." *Page 18 
 {¶ 47} For this reason, and based on the evidence produced at trial, we find that the trial court did not err in refusing to allow an instruction on voluntary manslaughter.
 {¶ 48} Jones' fourth assignment of error lacks merit.
III. SENTENCING
 {¶ 49} In his fifth assignment of error, Jones maintains that the trial court erred by ordering him to serve a consecutive sentence without first ordering a concurrent sentence and by making findings not supported by the record. Similarly, in his sixth assignment of error, Jones assigns error in the court's imposition of a maximum sentence without making the appropriate findings. Jones also argues that the ex post facto clause prevents a retroactive application of Foster to his case. As both assignments relate to the court's imposition of Jones' sentence, we address them together.
 {¶ 50} The Ohio Supreme Court has declared R.C. 2929.14(E)(4), which governed consecutive sentences, and R.C. 2929.14(C), which governed maximum sentences, unconstitutional and excised the offending parts from the statutory scheme. State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, applying United States v. Booker (2005), 543 U.S. 220, 125 S.Ct. 738;Blakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531 andApprendi v. New Jersey (2000), 530 U.S. 466, 120 S.Ct. 2348. *Page 19 
 {¶ 51} In Foster, the Ohio Supreme Court held that judicial fact-finding to impose the maximum or a consecutive sentence is unconstitutional in light of Blakely. The court also held that "after the severance, judicial fact-finding is not required before a prison term may be imposed within the basic ranges of R.C. 2929.14(A) based upon a jury verdict or admission of the defendant." Foster, supra. As a result, "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings and give reasons for imposing maximum, consecutive or more than the minimum sentence." Id.; State v. Mathis, 109 Ohio St.3d 54,2006-Ohio-855.
 {¶ 52} The jury convicted Jones of aggravated murder in violation of R.C. 2903.01(A), aggravated murder in violation of R.C. 2903.01(B), aggravated robbery in violation of R.C. 2911.01(A)(1) and aggravated robbery in violation of 2911.01(A)(3). The statutory range for the two aggravated murder counts that were merged by the trial court for the purposes of sentencing is life imprisonment without parole, life imprisonment with parole eligibility after serving twenty years of imprisonment, life imprisonment with parole eligibility after serving twenty-five full years of imprisonment, life imprisonment with parole eligibility after serving thirty full years of imprisonment. R.C.2929.03(A)(1). The statutory range for the two aggravated robbery counts that were also merged for purposes of sentencing is a prison term of three to ten years. R.C. 2929.14(A)(1). *Page 20 
 {¶ 53} The trial court sentenced Jones to a term of life in prison with parole eligibility after thirty full years on the aggravated murder offenses. The court also imposed a ten-year additional prison term on the offenses of aggravated robbery, to be served consecutive to the life term imposed for the aggravated murder counts. Pursuant toFoster, the trial court was not required to make any findings before imposing its sentence and had full discretion to sentence Jones within the statutory range. Moreover, the trial court made no findings under the now unconstitutional statutes; therefore, we find no error in the sentences.
 {¶ 54} We next consider whether Foster violates the ex post facto clause.
 {¶ 55} This court recently addressed this issue and, after a thorough analysis of state and federal law, found as follows:
 "In the instant case, Mallette had notice that the sentencing range was the same at the time he committed the offenses as when he was sentenced. Foster did not judicially increase the range of his sentence, nor did it retroactively apply a new statutory maximum to an earlier committed crime, nor did it create the possibility of consecutive sentences where none existed. As a result, we conclude that the remedial holding of Foster does not violate Mallette's due process rights or the ex post fact principles contained therein."
State v. Mallette, Cuyahoga App. No. 87984, 2007-Ohio-715.
 {¶ 56} Because we find the holding of Mallette, supra, directly applies to the instant matter, we adopt the Mallette court's holding. We therefore find that the remedial holding of Foster does not violate Jones' due process rights or the ex post facto principles contained therein. *Page 21 
 {¶ 57} Jones' fifth and sixth assignments of error are overruled.
IV. ALLIED OFFENSES OF SIMILAR IMPORT
 {¶ 58} In his final assignment of error, Jones maintains that the trial court erred in imposing a sentence on aggravated murder to be served consecutively to a maximum sentence of ten years on the aggravated robbery conviction as the charges are allied offenses of similar import. However, as the Ohio Supreme Court has repeatedly held, aggravated murder is not an allied offense of similar import to an underlying aggravated robbery. State v. Reynolds (1998),80 Ohio St.3d 670, 681; State v. Smith (1997), 80 Ohio St.3d 89, 117. See, also,State v. Bickerstaff (1984), 10 Ohio St.3d 62. See, also, State v.Frazier, 73 Ohio St.3d 323, 342.
 {¶ 59} Therefore, we find that Jones' seventh and final assignment of error lacks merit.
 {¶ 60} We affirm the decision of the trial court.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 22 
SEAN C. GALLAGHER, P.J., and MELODY J. STEWART, J., CONCUR
 APPENDIX
ASSIGNMENTS OF ERROR "I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST APPELLANT.
 II. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR ACQUITTAL AS TO THE CHARGE OF AGGRAVATED MURDER WHEN THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE THAT APPELLANT ACTED WITH PRIOR CALCULATION AND DESIGN.
 III. APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 IV. THE TRIAL COURT ERRED BY REFUSING TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF VOLUNTARY MANSLAUGHTER.
 V. THE TRIAL COURT ERRED BY ORDERING APPELLANT TO SERVE A CONSECUTIVE SENTENCE WITHOUT FIRST CONSIDERING A CONCURRENT SENTENCE AND BY MAKING FINDINGS NOT SUPPORTED BY THE RECORD.
 VI. THE TRIAL COURT ERRED WHEN IT SENTENCED APPELLANT TO A MAXIMUM SENTENCE WITHOUT MAKING THE APPROPRIATE FINDINGS.
 VII. THE TRIAL COURT ERRED BY ORDERING CONVICTIONS FOR SEPARATE COUNTS OF AGGRAVATED MURDER AND AGGRAVATED ROBBERY TO BE SERVED CONSECUTIVELY *Page 23 BECAUSE THE OFFENSES ARE ALLIED OFFENSES PURSUANT TO R.C. 2941.25 AND THEY ARE PART OF THE SAME TRANSACTION UNDER R.C. 2929.14." *Page 1