JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Shawn McGrath ("defendant"), appeals from his convictions and three-year prison sentence for the following offenses: assault, domestic violence, two counts of assaulting a police officer, and resisting arrest. For the reasons that follow, we affirm. *Page 3 
 {¶ 2} On February 17, 2006, at approximately 2:30 a.m., patrolmen Nagy and Schulte responded to a call that reported a male beating a female at a residence on West 91st Street in Cleveland, Ohio. They spoke with the sister-in-law of the reported victim. They heard a female screaming in the backyard of a house next door. The officers ran up the driveway and observed the defendant squatting directly in front of the victim and choking her. He had his right hand around her neck. She was gagging and he was pointing the other finger at her as if admonishing her about something.
 {¶ 3} When defendant saw the police, he got up and attempted to enter the rear of the house through a sliding glass door. Nagy told defendant to stop and that he was under arrest. Defendant failed to comply, causing Nagy to grab the back of defendant's pants in an effort to pull him back out of the house. Defendant turned around and slammed the door on Nagy's arm, causing him pain. A few minutes later, Officer Schulte began to assist Nagy in trying to pull the door open. Defendant was still trying to shut the door. At one point, defendant closed the door so far that he actually bruised Schulte's knuckles on his right hand. The State introduced a photograph which depicted Officer Schulte's hand injury.
 {¶ 4} It was dark inside of the house and the officers were concerned for their safety. They were trying to prevent a standoff with defendant when they proceeded to break the sliding glass door. Nagy injured his left elbow when he pulled the door off the sliding track in pursuit of defendant. Nagy was treated at Lakewood *Page 4 
Hospital's emergency room for a left elbow strain that day and was still receiving treatment for this injury as of the date of trial.
 {¶ 5} Defendant took a few steps back into a "fighting stance." Eventually, defendant submitted to his arrest.
 {¶ 6} The officers then spoke with the victim, who was intoxicated. She had blood around her lips and her neck was visibly reddened. The victim was crying quite a bit and her eyes were bloodshot. She was defendant's girlfriend and reported living at the same address. The victim became uncooperative and stated she no longer wished to have defendant arrested. She also refused medical attention.
 {¶ 7} There was a vehicle in the driveway that had been damaged, with a dent above the driver's door and the driver's side door window smashed out.
 {¶ 8} The State rested following the testimony of Officers Nagy and Schulte.
 {¶ 9} The victim, Kalee Jackson, testified on behalf of the defendant. On February 17, 2006, Jackson drove from her "hometown" of Lisbon, Ohio to defendant's residence in Cleveland. She drove defendant's car, which she was purchasing from him. She was pretty drunk when she arrived at defendant's residence.
 {¶ 10} Jackson began fighting with defendant because he did not want to go downtown with her because she was already really drunk. According to Jackson, the defendant kept trying to get the keys away from her. She testified that her *Page 5 
screaming was related to her efforts to keep and/or get her keys back from defendant. She denied that defendant hurt her in any way.
 {¶ 11} Jackson said she ran down the driveway because she somehow locked her keys inside the car with her purse. There she found her sister-in-law in a taxicab. But, Jackson then ran back up the driveway because she had no money (as her purse was inside the car). This is when she noticed that the window on her car was broken. Jackson grabbed her purse and wanted her keys again "because he [defendant] had gotten [her] keys again." Jackson then pushed, hit, and kicked the defendant. Defendant then grabbed her face and was trying to calm her down and kissed her.[1]
 {¶ 12} The next thing Jackson heard was "hold it" and that's when defendant ran into the house. Jackson testified that defendant shut and locked the sliding door. Then, the officers broke the door. She does not recall either officer getting their hands or arms caught in the door.
 {¶ 13} Jackson was questioned by the officers and was still angry that defendant would not just let her leave. She denied that she was bleeding that night. Jackson believed that she had a bloody lip from kissing defendant, who she claimed was the one that was bleeding. She denied sustaining any injuries. Jackson admitted that she refused to be photographed after the incident and that she refused medical attention. The next day she went to the police station to sign a statement *Page 6 
that she was not going to press charges against defendant. She found out later that evening that she was pregnant with defendant's child.
 {¶ 14} Jackson also testified that she had been in a relationship with defendant off and on for the past two years. Defendant is the father of her child. She stated that she had been "living back down home for over a month before [February 17, 2006]." She and defendant were dating and having sexual relations.
 {¶ 15} The State questioned Jackson about her place of residence on the date in question:
 {¶ 16} "Q. Okay. And they [the police] asked you for your address?
 {¶ 17} "A. Yeah.
 {¶ 18} "Q. You told them West 91st?
 {¶ 19} "A. Yeah. But I live — My dad's — I live there. Before I was pregnant my dad always said I had hot feet. I'm all over the place.
 {¶ 20} "* * *
 {¶ 21} "Q. You told the officers that you and the Defendant lived together for the past nine months?
 {¶ 22} "A. I might have. I can't really recall saying that about living with him for nine months. I might have said off and on for nine months because that's about what it was. We were off and on.
 {¶ 23} "* * *
 {¶ 24} "Q. You gave them the West 91st address? *Page 7 
 {¶ 25} "A. Yes. And I told them also my mailing address is the 41009 because I'm everywhere. I mean, I don't really know what to say about that. I mean, now I'm a little more tied down than what I used to be."
 {¶ 26} Later in trial, Jackson denied living at the West 91st Street address. However, during other testimony concerning defendant's arrest, Jackson was asked if there were curtains on the windows. She responded "No, we have no curtains."
 {¶ 27} Jackson never gave a written statement to police.
 {¶ 28} The defense rested after Jackson's testimony.
 {¶ 29} The State called Officer Nagy as a rebuttal witness. Nagy testified concerning statements Jackson made to him on February 17, 2006. Jackson stated that she parked her car in defendant's driveway. Defendant came out and broke the driver's window when Jackson was still sitting in the driver's seat. Defendant pulled Jackson from the car, hit her in the face, and then choked her.
 {¶ 30} Shortly after, Jackson stated she did not want defendant arrested. She told police that she lived at 2086 West 91st Street. Jackson indicated that she had lived there for the past nine months.
 {¶ 31} Defendant made an oral motion pursuant to Crim.R. 29 on counts one through five. The State requested the court to consider a lesser included offense under count one of misdemeanor assault. Subsequently, the State moved to amend count one of the indictment pursuant to Crim.R. 7(D) to a violation of 2903.11(A)(1). The trial court allowed an amendment on count one of the indictment that reduced the charge from felonious assault to misdemeanor assault. *Page 8 
 {¶ 32} The jury found defendant guilty of the following: assault in violation of R.C. 2903.13(A); domestic violence in violation of R.C.2919.25(A); two counts of assaulting a police officer in violation R.C.2903.13(A); and resisting arrest in violation of R.C. 2921.33(A).
 {¶ 33} On September 8, 2006, the trial court conducted a sentencing hearing. During sentencing, defense counsel acknowledged that Ohio Supreme Court precedent had excised certain portions of the sentencing statutes, particularly R.C. 2929.14(B), R.C. 2929.19(B), and R.C.2929.41 and that "there is no judicial fact finding necessary for either maximum or consecutive terms."
 {¶ 34} The trial court considered the factors of the sentencing law with the stated intention of imposing "a sentence commensurate with these factors and not demeaning the seriousness of the offense." The court noted that the offenses involved "extremely serious conduct." The court further considered that defendant was choking the victim, broke the car window, disregarded police orders, injured the officers, and resisted arrest. The trial court considered defendant's prior record, which included a previous kidnapping and assaults of other women. Defendant has numerous probation violations in his history and prior incarceration. The trial court considered defendant a danger to the community and likely to re-offend. Defendant was sentenced to serve six month terms for the assault and domestic violence charges, 18-month terms on the assault convictions on counts three and four, and 90 days for resisting arrest. The court ran the 18-month sentences consecutive to each other and concurrent to the terms imposed on the remaining counts. The trial *Page 9 
court found that "defendant [received] consecutive terms because [he] pose[s] the greatest likelihood of committing future crimes." The court went on to give various reasons in support of that finding.
 {¶ 35} The assignments of error will be addressed in the order presented for review.
 {¶ 36} "I. Mr. McGrath was denied the effective assistance of counsel."
 {¶ 37} To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. Strickland v.Washington (1984), 466 U.S. 668. Counsel's performance is deficient if it falls below an objective standard of reasonable representation.State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. To establish prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id. at paragraph three of the syllabus.
 {¶ 38} Defendant maintains that his counsel was ineffective because he did not request a limiting instruction that Jackson's statements to police could only be considered for purposes of impeachment. See Evid.R. 801 and 607.
 {¶ 39} Defendant believes that Jackson's statements to police were the only evidence that she cohabited with the defendant and that but for them, his conviction for domestic violence could not have occurred. The record reflects otherwise. *Page 10 
 {¶ 40} As set forth in detail above, Jackson testified at trial that she cohabited with defendant off and on for a period of nine months preceding the incident of February 17, 2006. In State v. Williams
(1997), 79 Ohio St.3d 459, the Ohio Supreme Court held:
 {¶ 41} "The offense of domestic violence * * * arises out of the relationship of the parties rather than their exact living circumstances.
 {¶ 42} "The essential elements of `cohabitation' are (1) sharing of familial or financial responsibilities and (2) consortium." Id., paragraphs 1 and 2 of the syllabus.
 {¶ 43} R.C. 2919.25(F)(2) provides:
 {¶ 44} "`Person living as a spouse' means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question."
 {¶ 45} In Williams, the Ohio Supreme Court declined to employ a narrow definition of "reside" by limiting "`family and household members' to those who actually share one residential address." Id. at 462; see, also, State v. Carswell, Ohio St.3d___, 2007-Ohio-3723, ¶ 35. Instead, the court found that "the offense of domestic violence arises out of the relationship itself, not the fact that the parties happen to share one address." Id. at 463. The court suggested that "[p]ossible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, and/or commingled assets. Facts that *Page 11 
might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations. These factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact."
 {¶ 46} In this case, Jackson provided ample testimony that she lived with defendant in Cleveland "off and on" for a period of nine months; they had a boyfriend-girlfriend relationship spanning a period of at least two years, which still existed at the time of trial; she was driving his car and carrying his child. When questioned about whether there were curtains on the windows at the West 91st
address, Jackson responded "No, we have no curtains." (Emphasis added.)
 {¶ 47} Jackson provided additional testimony of affection, society, solace, comfort, friendship, and aid, including her claim that defendant was acting out of concern for her well being. While Jackson's testimony was conflicting as to her residence, essentially portraying a nomadic lifestyle, she did not claim to live anywhere besides defendant's house either. For example, she indicated that she stayed with friends in Olmsted Falls sometimes and had a "mailing" address in Lisbon, Ohio. Despite these contentions, the record reflects that she never received the subpoenas delivered to any of these addresses, including the Lisbon address. Based on Jackson's testimony, the jury could reasonably conclude that defendant and Jackson commingled certain assets and had a relationship based upon society and conjugal relations. Accordingly, there was evidence beyond Jackson's statements to police that substantively established the cohabitation element of *Page 12 
domestic violence and, therefore, the lack of a limiting instruction did not result in the ineffective assistance of counsel.
 {¶ 48} We are also not persuaded that counsel rendered ineffective assistance by not requesting the limiting instruction with regard to the statements Jackson made to police about defendant choking her. Both officers testified that they observed defendant choking Jackson. She was bleeding and had red marks on her neck. Jackson denied this during her testimony and denied being hurt whatsoever. She tried to explain her bleeding lip by claiming that defendant was bleeding and kissed her. She, however, admitted that she refused to be photographed and refused medical attention. In light of all of the evidence, it is not reasonably probable that Officer Nagy's brief rebuttal testimony impacted the jury's decision to convict defendant on that count. Stated differently, it is not reasonably probable that the jury would have acquitted defendant on that charge in the absence of the rebuttal testimony.
 {¶ 49} Finally, it is not reasonably probable that the jury found the sister-in-law's statement to police that "a man was beating a women," pivotal in reaching their verdict on the assault charge involving Jackson.
 {¶ 50} Defendant has failed to establish a reasonable probability that had there been a limiting instruction concerning Jackson's out-of-court statement, the result of the trial would have been different. Accordingly, defendant's assigned error that his counsel was ineffective for not requesting one is overruled. *Page 13 
 {¶ 51} "II. The evidence was insufficient to sustain the conviction for domestic violence alleged in Count Two."
 {¶ 52} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 53} Defendant maintains that there was insufficient evidence to sustain his conviction for domestic violence. In particular, defendant asserts that there was no evidence that Jackson was "living as a spouse" beyond Jackson's out-of-court statements to police on February 17, 2006. This is not correct.
 {¶ 54} R.C. 2919.25(F)(2) provides:
 {¶ 55} "`Person living as a spouse' means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question."
 {¶ 56} Jackson's testimony concerning her actual residence on the date in question is contained previously in this opinion. *Page 14 
 {¶ 57} Defendant misconstrues the law by limiting "reside" and "family or household member" to be only those who share a residence in contradiction to the Ohio Supreme Court's holding in Williams.
 {¶ 58} As discussed previously in this opinion, there was sufficient evidence of this element to allow the charge of domestic violence to proceed to the jury.
 {¶ 59} Alternatively, defendant argues that the "living as spouse" element of the domestic violence statute is unconstitutional. This argument has recently been rejected by the Ohio Supreme Court inState v. Carswell,___Ohio St.3d___, 2007-Ohio-3723, ¶ 37, which holds:
 {¶ 60} "[T]he term `person living as a spouse' as defined in R.C.2919.25 merely identifies a particular class of persons for the purposes of domestic-violence statutes. It does not create or recognize a legal relationship that approximates the designs, qualties, or significance of marriage as prohibited by Section 11, Articule XV of the Ohio Constitution. Persons who satisfy the `living as spouse' category are not provided any rights, benefits, or duties of marriage. A `person living as a spouse' is simply a classification with significance to only domestic-violence statutes. Thus, R.C. 2919.25 is not unconstitutional and does not create a quasi-marital relationship in violation of Section11, Article XV of the Ohio Constitution."
 {¶ 61} Assignment of Error II is overruled.
 {¶ 62} "III. The trial court erred in imposing more than six-month concurrent prison terms on counts three and four." *Page 15 
 {¶ 63} Defendant argues that because his criminal conduct pre-datedState v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, that any retroactive application of Foster is a violation of the ex post facto clause and due process.
 {¶ 64} We have already addressed and rejected this argument. SeeState v. Shamaly, 2007-Ohio-3409, following State v. Mallette, Cuyahoga App. No. 87984, 2007-Ohio-715; State v. McCollins, Cuyahoga App. No. 88657, 2007-Ohio-2380; State v. Ferko, Cuyahoga App. No. 88182,2007-Ohio-1588; State v. Brito, Cuyahoga App. No. 88223, 2007-Ohio-1311;State v. Jones, Cuyahoga App. No. 88134, 2007-Ohio-1301. Further, defendant's sentence is not contrary to law and is supported by competent credible evidence in the record.
 {¶ 65} Assignment of Error III is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 16 
PATRICIA A. BLACKMON, J., and MELODY J. STEWART, J., CONCUR
[1] On cross-examination, Jackson stated that defendant grabbed her hands and "that's when he calmed [her] down." *Page 1